# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NANCY G. MALONEY, Derivatively on Behalf of FORTERRA, INC., <br><br>　　　　Plaintiff, <br><br>　v. <br><br> JEFFREY K. BRADLEY, W. MATTHEW BROWN, LORI M. BROWNE, WILLIAM KERFIN, KYLE S. VOLLUZ, KEVIN BARNER, ROBERT CORCORAN, SAMUEL D. LOUGHLIN, CLINT McDONNOUGH, JOHN McPHERSON, CHRIS MEYER, JACQUES SARRAZIN, CHADWICK S. SUSS and GRANT WILBECK, <br><br>　　　　Defendants, <br><br>　– and – <br><br> FORTERRA, INC., a Delaware corporation, <br><br>　　　　Nominal Defendant. | Civil Action No. _____ <br><br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS,
BREACHES OF FIDUCIARY DUTIES, CORPORATE WASTE
AND UNJUST ENRICHMENT**

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Forterra, Inc. ("Forterra" or the "Company") against certain members of its board of directors (the "Board") and certain of Forterra's current and former directors and senior executives (collectively, "Defendants").  This action seeks to remedy Defendants' violations of federal securities laws, breaches of fiduciary duty, corporate waste, and unjust enrichment.  This action arises out of a scheme and wrongful course of business that took place between March 2017 and August 2017 (the "Relevant Period"), whereby Defendants caused Forterra to:  (i) materially overstate its publicly reported financial results in violation of Generally Accepted Accounting Principles ("GAAP"); (ii) make other materially false and misleading statements and omissions; (iii) facilitate the false financial reporting by operating without effective internal controls; (iv) file materially false and misleading statements with the SEC; and (v) permit certain of its current and former executives to profit from this misconduct by pegging the payment of their cash bonuses to falsely reporting otherwise unattainable quarterly and annual financial targets.

2.      Defendants' misconduct and self-dealing has wreaked or threatened to wreak hundreds of millions of dollars of damages on Forterra.  The Company's senior executives were incentivized to issue materially false and misleading financial reports and statements to justify paying themselves outsized cash bonuses and

director fees.  As a result of Defendants' misconduct, the Company has been sued by purchasers of its common stock seeking hundreds of millions of dollars in damages on a class-wide basis for violations of federal securities laws.  Forterra has also been named as a defendant in a whistleblower retaliation lawsuit brought by a former senior executive expressly accusing it of intentionally falsifying its financial reports, which will make the class-wide securities claims harder for Forterra to defend.  The whistleblower also seeks, among other things, punitive damages.

3.      By authorizing and/or acquiescing in the accounting misstatements, Defendants: (i) caused Forterra to issue materially false and misleading financial reports and to file materially false and misleading financial statements with the SEC during the Relevant Period; (ii) deprived Forterra's shareholders their right to vote at the 2017 annual general meeting of shareholders based on accurate and complete reports of the Company's actual financial performance; (iii) exposed Forterra to hundreds of millions of dollars in potential liability to its investors, civil litigants and regulators, including the SEC; and (iv) caused Forterra to improperly pay an estimated $4 million in severance payments to three departing executives by permitting them to resign instead of being fired for cause and permitting them and other culpable executives to avoid being held to account for the potentially hundreds of millions of dollars in damages they caused.

4.     This action seeks recovery for Forterra against these faithless fiduciaries, as Forterra's Board is simply unable and/or unwilling to do so.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78(n), 78t(a)), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated thereunder.  This Court also has supplemental jurisdiction over all state law causes of action pursuant to 28 U.S.C. § 1367.

6.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), as well as 28 U.S.C. § 1391(b), because nominal party Forterra is organized under the laws of Delaware.  Forterra has also adopted a forum selection clause in its Certificate of Incorporation providing that "the sole and exclusive forum for any stockholder . . . to bring internal corporate claims . . . shall be a state court located within the State of Delaware. . . ."

## PARTIES

**Plaintiff**

8.      Plaintiff Nancy G. Maloney is a shareholder of Forterra, who holds and has continuously held Forterra common stock since February 17, 2017.

**Nominal Defendant**

9.      Nominal Defendant Forterra is a Delaware corporation headquartered at 511 East John Carpenter Freeway, 6th Floor, Irving, Texas 75062.

**The "Officer Defendants"**

10.      Defendant Jeffrey K. Bradley ("Bradley") was the Chief Executive Officer ("CEO") of Forterra between September 2015 and June 30, 2019 before his resignation from the Company.  Between July 2016 and June 30, 2019, Bradley was a member of the Forterra Board.

11.      Defendant W. Matthew Brown ("Brown") was an Executive Vice President of Forterra between April 2016 and September 6, 2017 before his resignation from the Company.  Between August 2015 and September 6, 2017, Brown was the Chief Financial Officer ("CFO") of Forterra.

12.      Defendant William Kerfin ("Kerfin") was President of Forterra Water Pipe & Products between April 2016 and July 23, 2018 before his resignation.  Over the 13 months before his appointment as President of Forterra Water & Pipe Products, defendant Kerfin served as Vice President of Sales for U.S. Pipe, which was acquired by Forterra on or about April 15, 2016.

- 4 -

13.     Defendant Lori M. Browne ("Browne") is, and has been since December 2017, an Executive Vice President and the General Counsel of Forterra. From June 2016 through December 2017, defendant Browne served as Forterra's Senior Vice President and General Counsel, and from March 2015 to June 2016, she served as Forterra's Vice President and General Counsel.

**The "Director Defendants"**

14.     Defendant Kyle S. Volluz ("Volluz") was a member of the Forterra Board between June 21, 2016 and September 25, 2018 when he resigned from the Company.  Defendant Volluz had also then-served as the managing director of Hudson Advisors L.P. (along with its related entities, "Hudson"), an affiliate of Forterra and of Forterra's controlling shareholder, Lone Star Fund IX (U.S.), L.P. (along with its related entities, "Lone Star"), since January 2015.  Defendant Volluz joined Hudson in 2009 and also served as a co-owner of LSF9 Cypress Parent 2 LLC.  Defendant Volluz also served as a Senior Vice President and Director of Legal Services for Goldman Sachs Specialty Lending Group, an affiliate of Goldman, Sachs & Co., from 2005 to 2009.  In such capacity, Volluz oversaw all legal issues impacting operating companies that are affiliates of Lone Star within North America, as well as other corporate investments for which Hudson provided asset management services in North America.  In particular, defendant Volluz had been actively

involved in the negotiation and closing of several Hudson lending transactions, acquisitions, and asset sales since joining Hudson in 2009.

15.     Defendant Kevin Barner ("Barner") was a member of the Forterra Board between October 2016 and April 2018 until he resigned from the Company. Defendant Barner has also served as a managing director of Lone Star North America Acquisitions LLC, an affiliate of Forterra and Lone Star, since December 2016.  Defendant Barner previously served as a director of Lone Star from June 2014 through December 2016 where he focused on origination and underwriting activities related to corporate private equity and debt investments throughout the Americas. Prior still, between August 2012 and June 2014, defendant Barner was a Vice President at Hudson, serving in an origination, underwriting and asset management role on various operating company investments made by several of Lone Star's funds.

16.     Defendant Robert Corcoran ("Corcoran") is, and has been since October 2016, a member of the Forterra Board.  Defendant Corcoran also serves as a Senior Advisor—Global Operations for Hudson, a position he has held since January 2016.  Defendant Corcoran was formerly President and Chief Operating Officer of Hudson, a position he held from July 2014 to December 2015, and prior to that he served as President and CFO of Hudson.

17.   Defendant Samuel D. Loughlin ("Loughlin") was a member and the Chairman of the Forterra Board between October 2016 and July 27 2017 before his resignation from the Company.   Defendant Loughlin also served as President of Lone Star North America Acquisitions, LLC, an affiliate of Forterra and Lone Star, where he was responsible for the management and oversight of all origination initiatives in North America.   Previously, from 2011 to 2013, he served as managing director and senior managing director of Lone Star U.S. Acquisitions, LLC. Defendant Loughlin joined Hudson in 2008 where he directed the management of the corporate assets located in North America.   From 2008 to 2011, he served in various capacities at Hudson, with responsibility for its retail and restaurant operating companies, including leading teams in special originations initiatives.

18.   Defendant Clint McDonnough ("McDonnough") is, and has been since October 2016, a member of the Forterra Board.   Defendant McDonnough has also served as a member of Forterra's Advisory Board since July 1, 2015.   Before retiring in June 2015, Defendant McDonnough was an audit partner at Ernst & Young LLP ("E&Y") for 38 years, most recently serving as the managing partner of the firm's Dallas office.    In his role as managing partner, Defendant McDonnough was responsible for leading all day-to-day practice operations in one of the firm's largest markets.   Prior to serving as managing partner of E&Y's Dallas office, Defendant McDonnough was the firm's managing partner of Assurance & Advisory Business

Services for the southwest area practice. E&Y'S Dallas office is and has been Forterra's outside independent auditing firm since prior to its IPO.

19.     Defendant John McPherson ("McPherson") is, and has been since October 2016, a member of the Forterra Board. Between 1995 and October 2011, defendant McPherson worked with defendant Chris Meyer at McKinsey & Company, Inc. ("McKinsey"), a global management consulting firm, most recently serving as its senior partner from 2006 to 2011.

20.     Defendant Chris Meyer ("Meyer") is, and has been since October 2016, a member of the Forterra Board, and since July 2017, its Chairman. Since April 2018, Defendant Meyer has also served as a Senior Managing Director of Hudson, an affiliate of Forterra and Lone Star, where he leads all acquisition efforts for Lone Star in North America. Defendant Meyer had previously served as a managing director of Hudson since February 2015. In that capacity, defendant Meyer had oversight responsibility for a number of Lone Star's private equity investments, including Forterra, and also assisted with the due diligence and underwriting of potential operating company investments. Prior to joining Hudson in February 2015, defendant Meyer held a number of positions with McKinsey, most recently serving as a director (senior partner). While at McKinsey, defendant Meyer managed the Dallas office, co-led the consumer practice group, and co-founded McKinsey's consumer marketing analytics center.

21.     Defendant Jacques Sarrazin ("Sarrazin") has been a member of the Forterra Board since October 2016.

22.     Defendant Chadwick S. Suss ("Suss") was a member of the Forterra Board between October 2016 and April 2018 before he resigned from the Company. Defendant Suss had also served as a director of Hudson since July 2015 and prior to that, served as a Vice President starting in August 2013.  Suss' responsibilities at Hudson included identifying investment opportunities, managing acquisition processes, driving portfolio company performance, and working on investment exits.  Defendant Suss' asset management responsibilities included the building products and shipping businesses of Lone Star's operating companies.

23.     Defendant Grant Wilbeck ("Wilbeck") was a member of the Forterra Board between October 2016 and April 2018 before he resigned from the Company. Defendant Wilbeck had also served as the senior managing director of Lone Star North America Acquisitions LLC, an affiliate of Forterra and Lone Star, where he served as a managing director from 2013 through December 2016.  Defendant Wilbeck focused on origination and underwriting activities related to corporate private equity and debt investments.  Previously, from 2007 to 2013, he served in various capacities at Hudson, with asset management responsibility across all retail and restaurant operating companies focusing on operational performance, capital structure, and acquisition opportunities.

24.    Each Defendant participated in the issuance and preparation of materially false and/or misleading statements by Forterra, including press releases and SEC filings.  During the Relevant Period, each defendant: (i) had access to internal corporate documents, conversations, and connections with other corporate officers and employees, (ii) attended meetings of management, the Board and its committees, and (iii) had accessibility to reports, audits and other information provided to them in connection with their service.  As current and/or former directors and/or officers of Forterra, each defendant knew (or should have known) of the adverse material, non-public information about Forterra's business, including its finances, markets, and present and future business prospects.

## DEFENDANTS' FIDUCIARY DUTIES

25.    Each officer and director of Forterra named herein owed Forterra the duty to exercise a high degree of care, loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Forterra's directors and officers complained of herein involves knowing, intentional, and culpable violations of their obligations as officers and directors of Forterra.  Further, the misconduct of Forterra's officers has been ratified by Forterra's Board, which has failed to take any legal action on behalf of the Company against them—and has indeed caused further

harm to Forterra by classifying resignations of certain Defendants as "not for cause" and then paying them millions of dollars in severance payments.

26.    Each of the Defendants, as present and/or former officers and/or directors of Forterra, have (or had) the ability to control the business and corporate affairs of the Company.  Defendants, as fiduciaries of a Delaware corporation, owed fiduciary duties of care, good faith, loyalty, care and complete candor.  As such, each of the Defendants were required (but failed) to control and manage Forterra in a fair, just, honest, and equitable manner, and exercise reasonable care in furtherance of the best interests of Forterra and its shareholders rather than disloyally benefitting themselves and their own personal interests.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to refrain from utilizing their control over Forterra to divert assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

27.    Because of their positions of control and authority as directors and/or officers of Forterra, each of the Defendants was able to and did, directly and/or indirectly, control the wrongful acts complained of herein.  As to Forterra's directors, these acts include:  (i) agreeing to and/or acquiescing in Defendants' false financial reporting; (ii) permitting Forterra to operate with defective internal

controls; and (iii) allowing certain Defendants to unjustly enrich themselves to the detriment of the Company.  By virtue of their positions with Forterra, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information, and was required to disclose these facts promptly and accurately to Forterra shareholders and the financial markets, but failed to do so.

28.    To discharge their duties, the directors of Forterra were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of Forterra.  By virtue of such duties, the officers and directors of Forterra were required to at the very least:

(a)    manage, conduct, supervise, and direct the business affairs of Forterra in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the charter and bylaws of Forterra);

(b)    neither engage in self-dealing nor knowingly permit any officer, director, or employee of Forterra to engage in self-dealing;

(c)    neither violate nor knowingly permit any officer, director, or employee of Forterra to violate applicable laws, rules, and regulations;

(d)    remain informed as to the status of Forterra's operations, including its accounting practices, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such

disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor owed to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets improperly paid to Company executives and directors together with the related costs and professional fees proximately caused by the unlawful conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Forterra and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial, and accounting controls, such that Forterra's financial statements would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(h)     supervise the preparation and filing of any financial reports or other information required by law from Forterra and to examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of Forterra and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

- 13 -

29.     Each Defendant, by virtue of his and/or her position as a director and/or officer of Forterra, owed to the Company fiduciary duties of loyalty, good faith, due care, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Forterra, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company has been ratified by each of the director Defendants who were members of Forterra's Board during the Relevant Period.

30.     Pursuant to Forterra's Code of Ethics and Business Conduct, Defendants were each charged with "conduct[ing] Company business adhering to both the letter and the spirit of this Code and all applicable laws, rules, and regulations in all cities, states, and countries in which the Company operates."  The Code of Ethics and Business Conduct further charged Defendants with causing all of Forterra's "public disclosures" to be accurate, stating in pertinent part as follows:

> Employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to the applicable supervisors and officers of significant transactions and the people involved, trends and other financial or non-financial information that may be material to the Company.  Employees are also responsible for timely reports of other

information not necessarily of a financial nature that could have a significant impact on the Company's business, financial condition or results of operations. Reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") or the NASDAQ Global Select Market ("NASDAQ"), and other public communications, must contain full, fair, accurate, timely and understandable disclosure. If any employee becomes aware of any material misstatement or omission in the Company's filings or other public communications, the employee must contact the Designated Officer.

31.     The Code of Ethics and Business Conduct further charged Forterra's senior executives with maintaining accurate financial reports, stating:

Senior financial officers are responsible for the accurate and reliable preparation and maintenance of the Company's financial records. Accurate and reliable preparation of financial records is critically important to proper management decisions and the fulfillment of the Company's financial, legal and reporting obligations. Diligence in accurately preparing and maintaining the Company's records allows the Company to fulfill its reporting obligations and provide stockholders, governmental authorities and the general public with full, fair, accurate, timely and understandable disclosure. Senior financial officers are responsible for establishing and maintaining adequate disclosure controls and procedures and internal controls and procedures, including procedures designed to accurately document and account for transactions on the Company's books and records, and for maintaining reports, vouchers, bills, invoices, payroll and service records, business measurement and performance records and other essential data with care and honesty.

32.     Forterra's Principles of Corporate Governance also specifically charged each of the individual defendants with: (i) "[a]ssessing the performance of the Chief Executive Officer (the 'CEO') and other senior management and setting their compensation;" (ii) "[o]verseeing the integrity of the Company's financial

statements and the Company's financial reporting process;" (iii) "[o]verseeing the Company's processes for assessing and managing risk;" (iv) "[o]verseeing legal and regulatory compliance;" and (v) "[p]roviding advice and counsel to management regarding significant issues facing the Company and reviewing and approving significant corporate actions."

33.     Defendants breached their duties of loyalty, good faith, care, and candor by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result, Forterra has expended and will continue to expend significant sums of money, including:

(a)     improvidently paying executive compensation and severance payments;

(b)     increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)     incurring possible civil lawsuit damages and/or SEC fines or penalties for improperly reporting overstated profits.

34.     These actions have irreparably damaged Forterra's corporate image and goodwill.  For at least the foreseeable future, Forterra will suffer from what is known

as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Forterra's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## SUBSTANTIVE ALLEGATIONS

**Forterra Is a "Controlled Company" Despite Its Public Stock Listing**

35.    Forterra was previously known as Hanson Building Products, a Texas-based building materials manufacturing company.

36.    Lone Star is an investment advisory firm that owns multiple other industrial manufacturing companies.

37.    In March 2015, controlling shareholder Lone Star purchased the Company's predecessor from HeidelbergCement AG for $1.4 billion in a highly leveraged buyout.  Before selling the Company to Lone Star, HeidelbergCement AG had unsuccessfully attempted to conduct an IPO to raise capital to pay down the company's already high debt load.  Following the acquisition by Lone Star, the acquired businesses that now make up Forterra were operated by LSF9 Concrete Holdings Ltd ("Concrete Holdings"), as a wholly owned subsidiary of Lone Star.

38.    In February 2016, Lone Star changed Concrete Holdings' name to Forterra.

39.     Before taking Forterra public in an October 2016 IPO, Lone Star caused Forterra to distribute the Company's brick business in the United States and Eastern Canada to an affiliate of Lone Star (the "Brick Disposition").  Following the Brick Disposition but before Forterra's IPO, Lone Star's remaining building products operations—operating in the United States and Eastern Canada—were transferred to Forterra in an internal reorganization under a common control transaction (the "Reorganization").

40.     During the Relevant Period, Forterra's only remaining operation was a manufacturer of pipe and precast products in the United States and Eastern Canada. The Company operated 96 manufacturing facilities located across North America that designed, manufactured, and distributed products used in infrastructure projects serving both residential and non-residential markets.

41.     In April 2016, Lone Star took the former combined company's U.K. operations public as a separate company, Forterra UK, in which Lone Star retained majority ownership.  Forterra has no relation with Forterra UK other than Lone Star's majority ownership of both companies.

42.     After acquiring the Company, Lone Star caused Forterra to make a series of acquisitions, including the following:

- USP Holdings, Inc. in April 2015 for $775 million, which operates in the water segment;

- Cretex Concrete Products, Inc. in October 2015 for $245 million, which operates in the drainage segment;

- Sherman-Dixie Concrete Industries, Inc. in January 2016 for $67 million, which operates in the drainage segment;

- Bio Clean Environmental Services, Inc. and Modular Wetland Systems, Inc. in August 2016 for $30 million, which operates in the drainage segment;

- J&G Concrete Operations LLC in October 2016 for $32 million, which operates in the drainage segment; and

- Precast Concepts LLC in October 2016 for $97.1 million, which operates in the drainage segment.

43.    To make all of these acquisitions, Lone Star—the Company's controlling stockholder—loaded the Company up with even more debt before its IPO.  As of June 2016, Forterra had approximately $1.2 billion of long-term debt—more than triple the amount it had carried just 21 months before, when Lone Star acquired it from HeidelbergCement AG.  Despite failing to effectively integrate these disparate businesses with Forterra, Lone Star caused the Company to acquire numerous companies with disparate accounting and financial systems.

**Forterra Initiates Its IPO; The Company Begins Trading Publicly**

44.    In October 2016, Lone Star caused Forterra to initiate the IPO and began trading as a public company.

45.    Following the October 2016 IPO, controlling shareholder Lone Star continued to hold more than 70% of Forterra's common stock through a series of holding companies.  As such, ***Defendants concede in Forterra's filing with the SEC***

- 19 -

*that it is a "controlled company" within the meaning of Nasdaq corporate*

*governance standards*, and that:

> Accordingly, [Forterra] currently avail[s] [itself] of the 'controlled company' exception available under the Nasdaq rules which exempts [it] from certain corporate governance requirements, such as the requirements that a company have a majority of independent directors on its board of directors, that compensation of the executive officers be determined, or recommended to the board of directors for determination, by a majority of the independent directors or a compensation committee comprised solely of independent directors, and that director nominees be selected, or recommended for the board of directors' selection, by a majority of the independent directors or a nominations committee comprised solely of independent directors.

**Forterra's Materially Defective Internal Controls and False Financial Reporting**

46.     Forterra has two reporting segments, each responsible for approximately half of its revenues—Drainage Pipe and Water Pipe. Drainage Pipe is driven by waste-water and storm-water infrastructure, highway infrastructure construction, and residential housing starts. Water Pipe sales are driven by residential housing starts and public spending on water supply construction and municipal infrastructure. By end market, Forterra has historically generated the largest portion of its revenue from U.S. residential markets (35%), followed by U.S. infrastructure (30%) and U.S. commercial (23%). Approximately 9% of corporate revenues were generated outside of the United States (largely in Canada).

47.     Beginning in March 2017—at the latest—and continuing through at least August 2017, Defendants caused Forterra to operate with materially defective

internal and reporting controls, which prevented the Company from being able to accurately calculate and report its financial results. Due to the material defects in Forterra's internal and reporting controls, beginning with the March 29, 2017 report of Forterra's fourth quarter and fiscal year 2016 ("4Q16" and "FY16," respectively) financial results, for the period ended December 31, 2016, Defendants caused Forterra to overstate its earnings by violating GAAP.

48.    For example, following the Company's acquisition of various operating subsidiaries caused by Lone Star, Forterra failed to integrate these subsidiaries into Forterra's corporate accounting system. During 4Q16, these same subsidiaries continued ordering supplies from their previous vendors. As a consequence, Forterra's accounting department was forced to make up purchase orders after receiving vendor invoices months after they had been issued. These invoices continued stacking up at Forterra's corporate accounting office in Irving due to its personnel being overwhelmed. As a result, when Forterra reported its 4Q16 and FY16 financial results in March 2017, it did not then have an accurate tally of all outstanding accounts payable. Forterra employees often joked about the vendor invoices going unpaid, and it was common knowledge within the Company that invoices were going unpaid for months, sometimes resulting in contractors threatening Forterra with liens or disruptions in service.

49.   In addition, faulty inventory accounting issues were resulting in discrepancies with regard to raw materials on hand at certain facilities, where the amount of raw materials shown on the books in Irving did not match what was actually on site.  The equipment at certain of Forterra's manufacturing facilities was also run down and had been neglected for too long, causing it to break down regularly, resulting in a lot of "waste" product being produced.  Forterra was also experiencing significant logistical problems delivering product to customers during FY16, particularly in the U.S. Pipe division acquired in 2016.   These production/waste problems frequently delayed projects and led to Forterra being "back-charged" by contractors for operational delays.  Meanwhile, Defendants' false financial reporting was camouflaging material ongoing declines in Forterra's organic sales during FY16 and Forterra had actually been losing significant business in its important pipe and precast business during FY16 due in large part to operational problems at its production plants.

50.   Nonetheless, on March 29, 2017, Defendants caused Forterra to issue a press release announcing that the Company's 4Q16 net sales had "increased to $354.1 million" and that its gross margin had "expanded to 17.0%."  Forterra also reported that its FY16 net sales had "increased to $1,364.0 million," its gross margin had "expanded to 20.6%," and that as a result, its net loss had "narrowed to $7.6 million."  Purporting to explain how this had been accomplished and how Forterra

then remained on track to achieve the outsized fiscal 2017 ("FY17") financial guidance being provided that day, the release stated that Forterra's 4Q16 "net sales increased by 80.4% to $354.1 million, compared to $196.3 million in the prior year quarter," with the "increase . . . attributable to the impact of acquisitions which increased net sales by $172.1 million," that "Drainage Pipe & Products net sales increased by 19.8% to $176.8 million, compared to $147.6 million in the prior year quarter, due to $31.4 million of net sales from acquisitions," and that "Water Pipe & Products net sales tripled to $177.3 million, compared to $48.1 million in the prior year quarter, due to net sales from [its] acquisitions of $140.7 million." It also stated that Forterra's FY16 net sales "increased to $1,364.0 million," adding that the "impact of acquisitions contributed $698.0 million to net sales," and that "Drainage Pipe & Products net sales increased to $728.9 million due to $222.1 million of net sales from acquisitions" and "Water Pipe & Products net sales increased to $632.6 million due to net sales from [its] acquisitions of $475.9 million."

51.     Despite the fact that these sales increases were due in large part to the revenue streams Lone Star had only recently acquired for Forterra, the March 29, 2017 release quoted defendant Bradley as stating that Defendants were "pleased with the significant accomplishments [Forterra] made in 2016 that laid the foundation for ***further growth and margin expansion***," and that "[a]ccretive acquisitions [had] expanded [the Company's] geographic scope, increased [its] market share in key

- 23 -

growth regions, enhanced the breadth of [its] product offerings, added an innovative and fast-growing stormwater treatment product line and enhanced [its] position as a market leader in water and drainage infrastructure pipe and products."  It further quoted Defendant Bradley as stating that "[t]he early results of [Forterra's] initiatives to drive margin expansion and lower costs [were] reflected in [its] results for the year," and that "***Forterra [was then] better positioned . . . to benefit from a favorable outlook across all three of [its] end markets than any time in the past***."

52.     On March 31, 2017, Defendants caused Forterra to file its FY16 Annual Report on Form 10-K with the SEC (the "2016 Annual Report"), which contained financial results similar to those reported in the March 29, 2017 press release.  The 2016 Annual Report ***was signed by*** Defendants Bradley, Brown, Barner, Corcoran, Loughlin, McDonnough, McPherson, Meyer, Sarrazin, Suss, Volluz, and Wilbeck. As to the effectiveness of Forterra's then-present internal and reporting controls, the 2016 Annual Report conceded that Forterra's "disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2016," but claimed that those control defects were limited to issues with inventory, bill and hold arrangements.  The 2016 Annual Report stated, in pertinent part, that management had identified a "[m]aterial weakness related to the aggregation of control deficiencies relating to inventory, including control deficiencies related to physical inventory counts, the evaluation of reserves for excess inventories, the periodic

review of manufacturing labor and overhead variances, and standard cost procedures," and a "[m]aterial weakness related to control deficiencies relating to bill and hold revenue transactions, including control deficiencies related to procedures to identify all bill and hold arrangements and sufficiently evaluate the accounting criteria prior to revenue recognition." Defendants expressly maintained that despite the limited disclosure control defects disclosed, the 4Q16 and FY16 financial results Forterra had reported in the March 29, 2017 release and in the 2016 Annual Report were accurate and complied with GAAP. The 2016 Annual Report also stated that:

> In light of these material weaknesses, we performed additional analyses and other procedures to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with US GAAP. These measures included, among other things, expansion of our year-end closing and consolidation procedures, and implementation of additional analytical reviews and verification procedures. As a result, we have concluded that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with U.S. GAAP.

53.     The 2016 Annual Report was also certified as being complete and accurate by Defendants Bradley and Brown pursuant to the Sarbanes-Oxley Act of 2002, with the relevant certifications stating in pertinent part as follows:

## SECTION 302 CERTIFICATION

I, [Bradley/Brown], certify that:

1.      I have reviewed this annual report on Form 10-K of Forterra, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

        (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**The False and Misleading 2017 Proxy**

54.     On or about April 28, 2017, Defendants caused Forterra to mail a materially false and/or misleading proxy statement to shareholders in connection with the Company's 2017 annual meeting of stockholders to be held on June 19, 2017 (the "2017 Proxy").[1]   At the 2017 annual meeting, shareholders of Forterra were asked, among other things, to: (i) elect four director nominees; (ii) ratify the appointment of E&Y continuing as Forterra's outside auditor for 2017; and (iii) "approve, on an advisory basis, the compensation of [its] named executive officers."   In other words, the Board, through the 2017 Proxy, sought shareholder action.

---

[1]  The 2017 Proxy incorporated the false and/or misleading statements set forth in the Company's 2016 Annual Report.  *See supra* at ¶¶52-53.

55.     The four director nominees that shareholders would be asked to reelect included Defendants Bradley, Barner, Corcoran, and Suss.

56.     E&Y was the same purportedly independent outside audit firm that had signed off on Forterra's materially false and misleading financial statements throughout 2016 and 2017.  It was also the same firm that had been charged with reviewing Forterra's internal controls in connection with its audits to ensure they were strong enough to permit the Company's financial reports to present fairly, in all material respects, its financial position, results of operations, and cash flows for the periods presented in conformity with U.S. GAAP.  E&Y had failed to do so.

57.     As to 2016 executive compensation, one of the items shareholders would be asked to approve on an advisory basis was the annual incentive compensation to be paid to Forterra's senior executives, including each of the Officer Defendants, with the 2017 Proxy stating in pertinent part that "[a]nnual cash performance bonus [were] payable based upon attainment of short-term objectives," that the "total target level of annual incentive compensation [was] set for each individual as a percentage of that individual's base salary," that "[a]nnual incentive awards [were] then earned based on (i) the achievement of financial metrics of the Company and/or one of its segments, as established by the boards of directors of [its] subsidiaries, Forterra Pipe & Precast, LLC and USP Holdings, Inc., as applicable, and (ii) the achievement by that individual of certain individual goals established by

Forterra Pipe & Precast, LLC's Board of Directors, for [Defendant] Bradley, and established by [Defendant] Bradley for his direct-reports, including all other NEOs except for [Defendant] Kerfin," and that Defendant "Kerfin's 2016 annual incentive award was based on the legacy plan of USP Holdings, Inc. that was approved prior to [Forterra's] acquisition of USP Holdings, Inc. in April 2016 for the period through September 30, 2016 and was based on [Forterra's] plan for the period of October 1, 2016 through December 31, 2016."

58.   Based in large part on Defendants' overstating the Company's 4Q16 and FY16 profits for the reasons detailed above in ¶¶50-53, stockholders approved the following payment of cash annual incentive bonuses as set forth in the 2017 Proxy:

- $1,222,656 to Defendant Bradley, based in large part on the "[a]chievement of commercial, operational and procurement savings under [the Board's] 2016 business plan;"

- $585,856 to Defendant Brown, based in large part on the "[a]chievement of commercial, operational and procurement savings under [the Board's] 2016 business plan;"

- $247,258 to Defendant Kerfin, based in large part his "[s]uccessfully transition[ing] into role as President of U.S. Pipe with minimal customer and operational impact," "[i]ntegrat[ing] Forterra concrete

and steel pipe business into the Water Pipe & Products segment," and "[o]ptimiz[ing] U.S. Pipe Fabrication structure;" and

- $207,948 to Defendant Browne, due in large part to her "[a]dvis[ing] and support[ing] all Company acquisitions and integrations, driving to deadlines and identifying any risks."

**The Truth Begins to Be Revealed**

59. On May 8, 2017, Defendants caused Forterra to announce without explanation that five days earlier, on May 3, 2017, Scott Leonard, Forterra's Executive Vice President and Chief Operating Officer, resigned.

60. On May 15, 2017, Defendants caused Forterra to issue a press release reporting its first quarter 2017 ("1Q17") financial results for the interim period ended March 31, 2017. According to the May 15, 2017 press release, Forterra's 1Q17 "net sales increased to $338.3 million, compared to $187.0 million in the prior year quarter," with the "sales growth . . . attributable to the impact of acquisitions that increased net sales by $163.0 million." The release also stated that "Drainage Pipe & Products ('Drainage') net sales improved to $160.4 million, compared to $144.3 million in the prior year quarter, due to $20.1 million of net sales from acquisitions," and that "Water Pipe & Products ('Water') net sales more than tripled to $177.8 million, compared to $40.5 million in the prior year quarter, due to net sales from [Forterra's] acquisition of U.S. Pipe of $142.9 million."

61.   Later, that same day, Defendants caused Forterra to file its 1Q17 quarterly financial report on Form 10-Q with the SEC (the "1Q17 10-Q"), which reported the same financial results disclosed in the May 15, 2017 release.  The 1Q17 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by Defendants Bradley and Brown.

62.   Once again, the 1Q17 10-Q stated that Forterra's "disclosure controls and procedures were not effective at the reasonable assurance level as of March 31, 2017" due in part to the previously disclosed "material weaknesses" in inventory, bill and hold and cost accruals.  The 1Q17 10-Q also identified "material weakness[es]" relating to the design and operating effectiveness of the Company's controls specifically "relat[ing] to the accounting for cost accruals, including control deficiencies related to the Company's lack of timely identification and processing of invoices during the financial statement close process to ensure cost accruals [were] complete. . . ."  The Company also noted that in the current quarter, Forterra "identified and corrected prior period errors related to cost accrual items which should have been recognized in 2016."  Forterra also noted that "[t]hese errors were primarily caused by insufficient coordination and communication between the Company's plant and corporate office locations."  Defendants disclosed that a "cumulative correction was recorded during the quarter ended March 31, 2017 which increased pretax loss by $4.6 million, of which $3.3 million increased cost of

revenues and $2.0 million increased selling, general and administrative expenses, partially offset by a $0.7 million increase in revenues."

63.     On this news of the Company's declining financial performance in 1Q17 and *failure to achieve any organic growth during the quarter*, the price of Forterra common stock declined materially, falling more than 24% on unusually high trading volume.   Importantly, this stock drop occurred despite Defendants' *false* contention that Forterra's 1Q17 financial results, reported on May 15, 2017, were accurate and complied with GAAP.   They did not.

64.     According to a May 16, 2017 *SeekingAlpha.com* report, "RBC Capital downgrade[d] [Forterra] shares to Sector Perform from Outperform and lower[ed] its target price to $16 from $23, *saying management's credibility has been compromised and investors should move to the sidelines until [Forterra] can string together a few quarters of consistent financial performance*."

65.     On June 19, 2017, Forterra held its annual meeting of stockholders.

66.     On June 21, 2017, Defendant Browne caused Forterra to file a Current Report on Form 8-K with the SEC disclosing, in pertinent part, that:

 • Defendants Bradley, Barner, Corcoran, and Suss each received the requisite shareholder approval for reelection;

- E&Y was overwhelmingly approved to continue to serve "as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2017;" and

- "The Company's stockholders . . . approved the compensation paid to [Forterra's] named executive officers as disclosed in the Proxy Statement. . . ."[2]

**Forterra Directors Begin Resigning From The Board**

67.     On July 31, 2017, Defendants caused Forterra to file a Current Report on Form 8-K with the SEC, signed by Defendant Browne, disclosing that on "July 27, 2017, Samuel D. Loughlin resigned from his position as Chairman and a member of the Board of Directors . . . of Forterra . . . , concurrent with his decision to retire from his position at Lone Star," and that Defendant Meyer would be appointed Chairman of the Board.

68.     On August 10, 2017, Defendants caused Forterra to issue a press release announcing its second quarter 2017 ("2Q17") financial results for the interim period ended June 30, 2017.  Once again the Company was forced to admit that it had produced ***no organic growth***.  Instead, Defendants stated that Forterra's net sales for

_____

[2]  60.8 million shares of Forterra common stock were cast in favor of the executive compensation proposal.

2Q17 "increased to $436.7 million, compared to $381.7 million in the prior year quarter," but that the sales growth *was attributable to the impact of acquisitions* that contributed $56.1 million to net sales.

69.     When Defendants caused Forterra to file its 2Q17 quarterly report on Form 10-Q with the SEC that same day (the "2Q17 10-Q"), the Company was forced to further disclose that its "disclosure controls and procedures were [still] not effective at the reasonable assurance level as of June 30, 2017 *because of the unremediated material weaknesses*" as to inventory, bill and hold and cost accruals.

70.     On this news, Forterra's stock price fell approximately 57% on August 10, 2017, again on unusually heavy trading volume.

**Significant Damage Suffered by Forterra Due to Defendants' Misconduct**

71.     Beginning on August 14, 2017, several purchasers of Forterra common stock filed putative class action complaints in the United States District Court for the Northern District of Texas Dallas Division against a group of defendants that varied by complaint but included the Company, certain members of its senior management, its Board, its controlling shareholder Lone Star and certain of its affiliates, and certain banks that acted as underwriters of the Company's IPO (the "Federal Securities Actions").[3] These lawsuits were brought on behalf of all persons

---

[3]   The Federal Securities Actions were subsequently consolidated and transferred to the Dallas Division of the Northern District of Texas in July 2018.

who purchased Forterra securities through August 14, 2017, generally alleging that statements made in connection with and after the IPO by Forterra and the defendants named in those complaints, contained materially false or misleading statements and/or omissions of material fact relating to: (i) the lack of growth from organic sales versus sales from acquisitions; (ii) increased pricing pressure on the Company's products; (iii) softness in the concrete and steel pressure pipe business; (iv) operational problems at plants, including problems relating to defective products; (v) unpaid invoices for products and services that resulted in understated expenses; and (vi) undisclosed material weaknesses in the Company's internal controls.  Those complaints sought tens of millions of dollars in damages pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and §§ 11 and 15(a) of the Securities Act of 1933.[4]

72.   On September 7, 2017, Defendants, without explanation or forewarning, disclosed that Defendant Brown had resigned effective immediately on September 6, 2017.  Defendants disclosed that the Board had determined to treat Defendant Brown's resignation "as a resignation for good reason pursuant to his

---

[4]   In a Consolidated Amended Complaint filed in the Federal Securities Actions on November 30, 2018, the claims were modified to cover only persons who purchased or otherwise acquired Forterra Stock in the IPO and only plead Securities Act of 1933 claims.

Amended and Restated Employment Agreement with Forterra Pipe & Precast, LLC dated as of June 28, 2016," rather than a resignation "for cause," which would have deprived him of severance benefits.  As a result of that determination by the Forterra Board (then comprising Defendants Bradley, Barner, Corcoran, McDonnough, McPherson, Meyer, Sarrazin, Suss, Volluz, and Wilbeck), Defendant Brown received an estimated severance payment valued at more than $1 million, comprising a base salary continuation, a pro-rated 2017 annual bonus, health care coverage continuation, and other related benefits.

73.    On February 21, 2018, Raymond Vuoncino ("Vuoncino"), the former Vice President of Operations of U.S. Pipe Fabrication, filed a lawsuit alleging retaliation against him for "whistleblowing activities concerning [the] financial reporting practices" of Forterra.  The lawsuit was filed in the United States District Court for the District of New Jersey, alleging violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6, *et seq.*, and the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, *et seq*.  The lawsuit named as defendants Forterra, Bradley, and Kerfin.  *See Vuoncino v. Forterra, Inc., et al.*, Case No. 18-cv-02437 (D.N.J. Feb. 21, 2018).  Vuoncino, who previously worked at KPMG and Dow Jones and had "over twenty-five (25) years of experience in corporate finance," reported to Defendant Kerfin at the time of his termination in retaliation for his whistleblowing activities.  According to Vuoncino, in connection

- 36 -

with calculating Forterra's 4Q16 and FY16 financial results reported on March 29, 2017, Defendants caused Forterra to overstate U.S. Pipe's 4Q16 and FY16 reported profits by causing one Pipe and Precasting division to order product from another Pipe and Precasting division at the end of the quarter, paid for by an intradivision "rebate" that was not properly accounted for, to build excess inventory "just to report additional profits in order to meet" otherwise unattainable "projected and monthly quarterly" sales goals. Vuoncino further alleged that Defendants had begun paying themselves cash bonuses on those falsified results "on a monthly basis with eighty percent (80%) of the bonus amount calculated on performance versus financial goals." In his action, Vuoncino seeks, among other things, compensatory, consequential, liquidated, and punitive damages, and interest from Forterra and Defendants Bradley and Kerfin.

74.    On March 7, 2018, Defendants caused Forterra to file its FY17 Annual Report on Form 10-K with the SEC (the "2017 Annual Report"). In the 2017 Annual Report, Defendants disclosed that the Company's internal and reporting controls still contained material defects, now including a "material weakness related to the aggregation of control deficiencies *over the revenue recognition process*, primarily related to the ineffective design and operating effectiveness of controls over the verification of physical shipments and internal validation of customer approvals of sales order terms prior to recognizing revenue."

75.     On April 5, 2018, Defendants caused Forterra to file a Current Report on Form 8-K with the SEC, signed by Defendant Browne, disclosing that "[o]n March 31, 2018, Kevin Barner and Grant Wilbeck" and "[o]n April 3, 2018, Chadwick Suss" had all suddenly "resigned from the Board," effective immediately, without any explanation for the resignations.  Defendants promptly replaced Barner, Suss, and Wilbeck with three new directors:

- Richard "Chip" Cammerer, Jr. ("Cammerer") (who had also served as a managing director of Hudson since January 2016 and who also previously served as member of the board of directors of Forterra plc, a former affiliate of Forterra, between March 2016 and April 2017);

- Dominic LaValle ("LaValle") (who had also served as a managing director of Hudson since January 2018, had previously served as a director of Hudson from July 2015 through December 2017, and was then responsible for sourcing, executing, and managing Hudson's private equity investments); and

- Chad Lewis ("Lewis") (who had also served as a Vice President of Hudson responsible for executing and managing Hudson's private equity investments since June 2015 and who previously served as an associate of Hudson from January 2015 to June 2015).

Defendants disclosed that "*as non-independent directors*," directors Cammerer, LaValle, and Lewis would not be compensated "for their services rendered as a member of the Board."

76.    On July 24, 2018, Defendants caused Forterra to file a Current Report on Form 8-K pursuant to a purported "internal management realignment" of the Water & Pipe Products segment, wherein Defendants suddenly announced that Defendant "Kerfin, the President of the segment and a named executive officer for 2017, [would] be leaving the Company in connection with the realignment, effective July 23, 2018."   As they had done with Defendant Brown, the Board deemed Defendant Kerfin's termination "a termination without cause" and thus paid him hundreds of thousands of dollars in severance payments, "including continued payment of his annual base salary at the time of separation, which was $375,000, for a period of twelve months after post-termination, a pro-rated annual bonus payment for 2018 (based on actual Company performance for the year), payable at the time that the Company pays bonuses to other executives for fiscal year 2018, and continuation of health coverage under COBRA."

77.    On October 1, 2018, Defendants disclosed that on September 25, 2018, Defendant Volluz had also resigned from the Board effective immediately, again with no explanation for his resignation.  In his place, Rafael Colorado ("Colorado"), who had served since 2016 as a director with Hudson and as a legal advisor to

Forterra U.S. Holdings, LLC "on legal issues impacting operating companies that are affiliates of Lone Star within North America, as well as other corporate investments for which Hudson or its subsidiaries provide underwriting and asset management services in North America," was appointed to the Forterra Board by Defendants. Defendants disclosed that "Colorado ha[d] been actively involved in the negotiation and closing of numerous acquisitions, asset sales and lending transactions, for the Company and other Lone Star portfolio companies." Defendants disclosed that "as *a non-independent director*," Colorado would "not receive any compensation from the Company for his services rendered as a member of the Board."

78.     After disclosing in its first, second, and third quarter 2018 financial statements that Defendants had still been unable to remediate the substantial defects in Forterra's internal controls, on December 20, 2018, Defendants filed an amendment to Forterra's 2017 Annual Report, now disclosing that "[s]ubsequent to the issuance of the Original 10-K, the Public Company Accounting Oversight Board ('PCAOB') conducted an inspection of Ernst & Young LLP's ('EY') audit of the Company's consolidated financial statements for the year ended December 31, 2017" and that "[i]n connection with this inspection, EY performed additional testing pertaining to certain controls related to [Forterra's] information technology ('IT') systems and subsequently requested a reevaluation by management of those

controls." Defendants further disclosed that as a result of this further evaluation, they had "identified ***an additional material weakness related to the aggregation of control deficiencies over the Company's IT systems*** as of December 31, 2017," admitting that "the Company did not maintain effective controls over user access to IT systems and changes to IT programs and data and, as a result, the effective functioning of certain process-level automated and IT-dependent controls could have been affected."

79.     On December 27, 2018, Defendants disclosed that on December 21, 2018, Defendant LaValle had suddenly and expectedly resigned from the Board effective immediately, again with no explanation for his resignation. Defendant LaValle had only first joined the Forterra Board in April 2018. In his place, on January 10, 2019, Defendants appointed Allison Naviskas ("Naviskas"), who was then also serving a managing director of global business development and strategy at Lone Star. Previously, Navitskas had served as a managing director with Hudson, serving in a variety of roles, "provid[ing] services in both business and legal capacities, which ha[d] included negotiation and closing of numerous acquisitions, asset sales and lending transactions as an in-house attorney." Defendants disclosed that "as ***a non-independent director***," Navitskas would "not receive any compensation from the Company for her services rendered as a member of the Board."

- 41 -

80.     On April 19, 2019, Defendants caused Forterra to file with the SEC the 2019 proxy (the "2019 Proxy") soliciting shareholder support for several proposals at its annual meeting of stockholders.  The 2019 Proxy expressly conceded the non-independence of directors Bradley, Cammerer, Colorado, Corcoran, Lewis, Meyer, and Naviskas.  The Board recommended that shareholders approve the continuing directorships of Defendants McDonnough, McPherson, and Sarrazin, who Defendants claimed to be purportedly "independent."  Directors Colorado, Lewis and Naviskas were not put before the shareholders for a vote, despite never being approved by shareholders.  Since directors Colorado, Lewis, and Naviskas have never been voted into office by shareholders, each of these directors' loyalty and fidelity is to Lone Star, the Company's controlling stockholder.

81.     On June 24, 2019, without explanation or forewarning, Defendants disclosed that Defendant Bradley was now resigning his CEO role and his directorship effective immediately on June 30, 2019 and June 21, 2019, respectively. The Forterra Board (then comprised of McDonnough, McPherson, Sarrazin, Cammerer, Colorado, Corcoran, Lewis, Meyer, and Naviskas) approved a Separation and Release Agreement with Defendant Bradley which provided him more than $3 million in severance benefits, as follows:  (i) a lump-sum payment of $875,000; (ii) a lump-sum payment of $1,750,000 (representing one year base salary and one year of performance bonus at target); (iii) a lump-sum payment of $433,904

(a prorated portion of his 2019 performance bonus at target); and (iv) reimbursement of the cost of COBRA premiums.  Defendant Bradley was also permitted to retain the 105,000 vested pool units in the LSF9 Concrete Holdings Ltd. Long Term Incentive Plan through July 8, 2021.  As they had previously done with Defendants Brown's and Kerfin's departures, Defendants sought no contribution from Defendant Bradley for the damages he has caused Forterra as alleged herein.

82.    In Defendant Bradley's place, Karl H. Watson, Jr. ("Watson") was appointed CEO of Forterra and Defendant McPherson was appointed Lead Director and non-executive Vice Chairman of the Board.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

83.    Plaintiff brings this action derivatively in the right and for the benefit of Forterra to redress injuries suffered and to be suffered by Forterra as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, corporate waste, and unjust enrichment.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

84.    Plaintiff will adequately and fairly represent the interests of Forterra and its shareholders in enforcing and prosecuting the Company's rights.

85.    Based upon the facts set forth throughout this complaint, applicable law, and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Forterra Board to institute this action against the

Company's executive officers and members of the Forterra Board is excused as futile. A pre-filing demand on the Forterra Board, now comprising of (i) Meyer; (ii) Cammerer; (iii) Colorado; (iv) Corcoran; (v) Lewis; (vi) McDonnough; (vii) McPherson; (viii) Navitskas; (ix) Sarrazin; and (x) Watson, would be a useless and futile act because:

      (a)     Directors Meyer, Corcoran, McDonnough, and McPherson each face a substantial risk of liability in the Federal Securities Actions for conduct that arises out of the same facts and circumstances as set forth herein and, thus, reasonable doubt exists as to their ability to exercise independent and disinterested business judgment. Indeed, Forterra, Defendants Bradley, Barner, Brown, Browne, Volluz, Loughlin, Suss, and Wilbeck, and controlling shareholder Lone Star and its related entities, are all named as defendants in the Federal Securities Actions detailed *supra* in ¶71, with each being charged with violations of §§ 11 and 15 of the Securities Act of 1933. Any suit by the current directors of Forterra to remedy these wrongs would likely further expose the liability of certain of these defendants under the federal securities laws—including controlling shareholder Lone Star—which could result in additional civil and/or criminal actions being filed against one or more of these defendants, thus, these directors are hopelessly conflicted in making any supposedly independent determination of whether to sue. In light of the Federal Securities Actions, it is not possible for these Defendants in this case, who comprise

a majority of the demand board when this action was filed, to consider a demand impartially.  This is so because if the Company pressed forward with its rights of action against these defendants in this case, then the Company's efforts would undercut or even compromise the defense of the Federal Securities Action.  For this reason alone, demand is futile.

(b)    Director Watson is neither independent nor disinterested by virtue of the fact that he is an executive officer of the Company, both because he needs to stay in the good graces of his fellow directors in order to retain his livelihood and because controlling shareholder Loan Star—his employer—is named as a defendant in the Federal Securities Actions.  Indeed, Defendants expressly conceded in Forterra's 2019 Proxy that "directors who are members of [Forterra's] management," such as Watson, are not independent due to their executive positions with the Company and their relationships with and dependence upon the other members of the Board for their livelihood.  Thus, Watson cannot discharge his fiduciary duty to independently and disinterestedly investigate and prosecute the claims alleged herein.

(c)    Director Defendants Meyer, Corcoran, McDonnough, McPherson, and Sarrazin each breached their duty of loyalty by causing Forterra to file numerous materially misleading SEC filings and failing to institute proper internal controls, and thus are ***not*** entitled to Business Judgement Deference.

Moreover, by virtue of the fact that Defendants McDonnough (Chair) and McPherson were members of the Board's Audit Committee during the Relevant Period, which committee was charged with "represent[ing] the Board of Directors in discharging its responsibilities relating to the Company's accounting, financial reporting, financial practices and system of internal controls," and "[a]s part of its oversight role, the Audit Committee . . . reviewed and discussed with Company's management the Company's audited consolidated financial statements included in [Forterra's] 2016 Form 10-K," Defendants McDonnough and McPherson were directly complicit in causing Forterra to file numerous materially misleading SEC filings and failing to institute proper internal controls in breach of their fiduciary duties and are not entitled to Business Judgement Deference.

(d)     Likewise, Defendants Meyer (Chair), Lewis and McPherson were each members of the Board's Compensation Committee.  As members of the Board's Compensation Committee, each director was charged with "reviewing and approving corporate goals and objectives relevant to the compensation of [Forterra's] executive officers. . . ."  Based on the evaluation of these goals and objectives, the Compensation Committee was charged with "setting compensation for [those] officers."  Despite their charge, the Compensation Committee permitted Defendant Bradley, Brown and Kerfin to resign "without cause" instead of "for good reason."  As such, Forterra entered into the Separation and Release Agreements with

Defendants Bradley, Brown, and Kerfin.   Under the Separation and Release Agreements, Defendant Bradley, Brown and Kerfin walked away with approximately $4.375 million in severance payments rather than being called upon to indemnify Forterra for their misconduct.   By these actions, Defendants Meyer, Lewis, and McPherson are directly complicit in this corporate waste, breached of their fiduciary duties to Forterra and its shareholders, and are not entitled to Business Judgement Deference.

(e)      Defendants expressly concede in the 2019 Proxy that other than Defendants McDonnough, McPherson, and Sarrazin, whom they characterize as independent, none of the other six members of the Forterra Board—a clear majority —are independent (including Watkins, Cammerer, Colorado, Corcoran, Lewis, Meyer, and Naviskas) as a result of their employment with Forterra and/or Lone Star.  Defendants concede that:  (i) Forterra is controlled by Lone Star and its related entities, including Hudson, which collectively beneficially own more than 70% of Forterra's outstanding common stock; (ii) a majority of the ten current members of the Forterra Board are employed by or are consultants for Lone Star, including Meyer, Cammerer, Corcoran, Colorado, Naviskas, and Lewis; (iii) Defendants Bradley, Brown, Corcoran, McDonnough, Meyer, and Volluz collectively own significant equity in Lone Star; (iv) pursuant to Lone Star's Asset Advisory Agreement with Forterra, a loan to the bricks business spun off to an affiliate of Lone

Star, Lone Star's Registration Right Agreement with Forterra, and Lone Star's Tax Receivable Agreement with Forterra, Lone Star has a material financial interest in Forterra; and (v) Forterra's 2019 Proxy concedes that "directors who are members of our management or are employed by or consultants for Lone Star" are not independent, meaning that Watkins, Cammerer, Colorado, Corcoran, Lewis, Meyer, and Naviskas cannot discharge their fiduciary duties to independently and disinterestedly investigate and prosecute the claims alleged herein. The non-independence of these Defendants is significant here where Lone Star is a defendant in the Federal Securities Actions where Lone Star is accused of having put Forterra together through a massive acquisition scheme and then failed to effectively integrate it or to put in effective internal controls prior to taking the Company public, resulting in Forterra misstating its financial statements in connection with the IPO.

(f)     Because the directorships of Colorado, Lewis, and Naviskas have never been approved by shareholders and they bide their allegiance only to the other directors and controlling shareholder Lone Star who appointed them, none of these directors is independent or disinterested.

(g)     Defendant McDonnough is neither independent nor disinterested for an entirely separate reason. Defendant McDonnough is a retired managing partner of E&Y's Dallas office. E&Y's Dallas office served as Forterra's outside auditor prior to its IPO and throughout the Relevant Period. Indeed, E&Y's Dallas

office continues to serve as Forterra's outside auditing firm despite Defendants' repeated admissions of material internal control defects.  There are numerous facts alleged herein potentially implicating E&Y in future litigation, including: (i) PCABC's findings of defects in E&Y's audits of Forterra; (ii) the serious intentional financial falsification and whistleblower retaliation charges alleged by Vuoncino in the whistleblower retaliation action; and (iii) the fact that Forterra has now been sued for issuing false and misleading financial statements throughout its entire history as a publicly traded company in a securities class action seeking tens of millions of dollars in damages.  In light of these serious allegations, implicating E&Y in the alleged misconduct, Defendant McDonnough cannot discharge his fiduciary duty to independently and disinterestedly investigate and prosecute these alleged claims because they potentially implicate his former partners and employer upon whom he still relies to fund his retirement.

(h)    The members of Forterra's entire Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people with whom they have developed professional relationships, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.  For

instance, on June 6, 2017, prior to filing his whistleblower retaliation lawsuit, Vuoncino filed a complaint with the U.S. Department of Labor, Occupational Safety and Health Administration, which Forterra received notice of, alleging that he had "engaged in protected activity, of which Forterra had knowledge, he was terminated by [Forterra and Defendants Bradley and Kerfin] as a result of his protected activity and it was a determinative factor in his firing." Rather than investigating Vuoncino's claims and acting, or reporting them to the SEC and Forterra's shareholder owners, the Board did nothing, prompting the filing of Vuoncino's federal action. The Company is now potentially exposed to tens of millions of dollars in the whistleblower retaliation action and in the Federal Securities Actions. Likewise, Defendants Brown, Kerfin, and Bradley were all permitted to walk away with millions of dollars in severance payments rather than being forced to account for their misconduct in connection with their terminations.

(i)     The Forterra Board and the Company's senior management participated in, approved, and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Forterra's stockholders, or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents or conversations and connections with other corporate officers, employees, and directors and attendance

at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the false financial reporting and the failure to pursue remedies against Defendants Brown, Kerfin, and Bradley and instead deemed to pay them more than $4 million in improper severance payments.  Under their specific duties as Board members, the director Defendants are charged with the management of the Company and conducting its business affairs.  Defendants breached the fiduciary duties they owed to Forterra and its shareholders in that they failed to prevent and correct the false financial reporting and failed to pursue remedies against Defendants Brown, Kerfin, and Bradley and instead deemed their terminations "for good reason" and without cause in order to pay them more than $4 million collectively in improper severance payments.  Certain directors are also dominated and controlled by Lone Star and other directors and cannot act independently of them.  Thus, the Forterra Board cannot exercise independent, objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(j)     The acts complained of constitute violations of Forterra's officers and directors fiduciary duties of loyalty and good faith and cannot be ratified.

(k)     Forterra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others—including Defendants Bradley, Brown, Browne, and Kerfin—who were responsible for the wrongful conduct alleged herein to attempt to recover for Forterra any part of the damages Forterra suffered and will suffer.

(l)     Forterra's current and past officers and directors are protected against personal liability for their acts of mismanagement, corporate waste, and breach of fiduciary duties alleged in this complaint by directors' and officers' liability insurance they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Forterra.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering Defendants in this case contain provisions which eliminate coverage for any action brought directly by Forterra against these Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain officers of Forterra, there would be no directors' and officers' insurance protection and thus, another reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to

effectuate a recovery.  For this reason, and the reasons *collectively* set forth in ¶85(a)-
(k), demand is futile.

## COUNT I

## VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9 PROMULGATED THEREUNDER AGAINST DEFENDANTS BRADLEY, BROWN, BARNER, CORCORAN, LOUGHLIN, McDONNOUGH, McPHERSON, MEYER, SARRAZIN, SUSS, VOLLUZ, AND WILBECK

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

88.     Defendants Bradley, Brown, Barner, Corcoran, Loughlin, McDonnough, McPherson, Meyer, Sarrazin, Suss, Volluz, and Wilbeck signed, issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in or incorporated by reference into the Company's 2017 Proxy.   The 2017 Proxy contained recommendations from the Board to the Company's shareholders that they should both vote to reelect the four directors standing for reelection—including Defendants Bradley, Barner, Corcoran, and Suss—approve the reengagement of E&Y as

Forterra's independent outside audit firm, and approve the millions of dollars in 2016 executive compensation, including the cash bonuses payable to, among others, Defendants Bradley, Brown, Browne, and Kerfin.

89.    As alleged herein, the 2017 Proxy contained untrue statements of material facts and omitted material facts necessary to make the statements that were made therein not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The 2017 Proxy was an essential link in obtaining shareholder approval of several of the Board's proposals at the 2017 annual meeting of Forterra's shareholders.

90.    The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and Section 14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

91.    The 2017 Proxy and the 2016 Annual Report incorporated therein by reference misrepresented material information, in particular, they overstated the Company's 2016 financial results and the soundness of the Company's then-present internal reporting and disclosure controls.  This was material to investors because, as detailed *supra* at ¶¶57-58, the 2017 Proxy expressly stated that the "[a]nnual cash performance bonus[es]" payable to Forterra's senior executives were "payable based upon attainment of short-term objectives," including being "based on . . . the achievement of financial metrics of the Company and/or one of its segments, as

established by the boards of directors of [its] subsidiaries, Forterra Pipe & Precast, LLC and USP Holdings, Inc., as applicable."  As detailed *supra* in ¶¶62, 69, 74 and 78, Defendants would later concede that at the time those results were calculated and reported, "Forterra had a 'material weakness related to the design and operating effectiveness of controls related to the accounting for cost accruals, including control deficiencies related to the Company's lack of timely identification and processing of invoices during the financial statement close process to ensure cost accruals [were] complete," such that in the 1Q17, "the Company identified and corrected prior period errors related to cost accrual items which should have been recognized in 2016," disclosing that a "cumulative correction was recorded during the quarter ended March 31, 2017 which increased pretax loss by $4.6 million, of which $3.3 million increased cost of revenues and $2.0 million increased selling, general and administrative expenses, partially offset by a $0.7 million increase in revenues." Moreover, as detailed *supra* in ¶73, Vuoncino later disclosed in his Sarbanes Oxley Act of 2002 whistleblower retaliation lawsuit that that Defendants had intentionally overstated Forterra's 4Q16 and FY16 financial results by improperly accounting for intracompany rebates paid for no other reason than to overstate Forterra's profits in the 4Q16 and FY16.  Vuoncino further disclosed that Defendants had begun paying themselves the 2016 cash bonuses on those falsified results "on a monthly basis with

eighty percent (80%) of the bonus amount calculated on performance versus financial goals."

92.    At all relevant times to the dissemination of the materially false and/or misleading 2017 Proxy, Defendants were aware of and/or had access to the true facts concerning Forterra's true financial condition and lack of effective reporting and internal controls that their statements misrepresented.

93.    The individual Defendants were at least negligent in filing the 2017 Proxy with these materially false and misleading statements.

94.    The false and misleading statements in the 2017 Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote not only to reelect the four directors to the Board, but to approve the payment of millions of dollars in cash bonuses to executives as a reward for cooking the books. A reasonable investor would view a full and accurate disclosure of these facts as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to shareholders.

95.    By reason of the foregoing, each of the Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

96.    If not for the materially misleading 2017 Proxy, shareholders would not have voted to reelect the four directors and to approve the payment of millions of dollars in cash bonuses to the Officer Defendants.

97.     Thus, as a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy Defendants used to obtain shareholder approval of several proposals that benefited them to the detriment of Forterra and its shareholder owners, Forterra has suffered damages in an amount to be determined at trial and Plaintiff is entitled to such equitable relief as the Court deems proper.  By reason of the misconduct detailed herein, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

**COUNT II**

**VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST DEFENDANTS BRADLEY, BROWN, BARNER, CORCORAN, LOUGHLIN, McDONNOUGH, McPHERSON, MEYER, SARRAZIN, SUSS, VOLLUZ AND WILBECK**

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     The Defendants acted as controlling persons of Forterra within the meaning of § 20(a) of the 1934 Act.

a.     By virtue of their positions as current and/or former officers and directors, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading statements contained in numerous SEC filings (*see supra* ¶¶50-58), Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the

- 58 -

Company, including the content and dissemination of the various statements which Plaintiff contends are misleading.

b.     Each of the Defendants were provided with or had unlimited access to copies of the SEC filings and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

c.     Each of the Defendants personally participated in causing Forterra to issue the materially false and misleading 2016 Annual Report and 2017 Proxy.  Because of their positions with the Company, each Defendant possessed the power and authority to control the contents of Forterra's 2016 Annual Report and the 2017 Proxy; each was provided with copies in draft before filing with the SEC; and each had the ability and opportunity to prevent their issuance or cause them to be corrected.  The 2016 Annual Report was filed with the SEC stating that its filing under their signatures was "duly authorized" by Defendants Bradley, Brown, Barner, Corcoran, Loughlin, McDonnough, McPherson, Meyer, Sarrazin, Suss, Volluz, and Wilbeck.  The 2017 Proxy was filed with the SEC and distributed to shareholders containing the express recommendation of Defendants Bradley, Barner, Corcoran, Suss, Loughlin, McDonnough, McPherson, Meyer, Sarrazin, Volluz, and Wilbeck (the then-Board) that shareholders approve the slate of proposals being put forth,

including "unanimously recommend[ing] that [shareholders] vote FOR all four of its nominees" to the Board, "unanimously recommend[ing] that [shareholders] vote FOR the ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ending December 31, 2017," and "unanimously recommend[ing] that [shareholders] vote FOR the approval, on an advisory basis, of the compensation of the Company's named executive officers." Because of their positions with the Company and their access to material, non-public information, these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

100. The Defendants acted as controlling persons of Forterra within the meaning of § 20(a) of the 1934 Act.

<u>**COUNT III**</u>

**BREACH OF FIDUCIARY DUTIES AGAINST ALL DEFENDANTS**

101. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102. Each of the Defendants agreed to and did participate with the other Defendants in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties the Defendants owed to the Company.

103.    The Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to Forterra, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their related entities' and colleagues' interests ahead of the interests of Forterra and its shareholders.

104.    As demonstrated by the allegations above, Defendants failed to exercise the care required and breached their duties of care, loyalty, good faith, and candor owed to Forterra and its public shareholders, and they have failed to disclose material information and/or made material misrepresentations to shareholders regarding Forterra's falsified financial reporting during the Relevant Period.

105.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Forterra and its public shareholders.

106.    As a proximate result of Defendants' conduct, in concert with the other Defendants, Forterra has been injured and is entitled to damages.

## COUNT IV

## CORPORATE WASTE AGAINST ALL DEFENDANTS

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away

approximately $4.375 million to Defendants Bradley, Brown, and Kerfin via their severance payments (as detailed *supra* at ¶¶72, 76, and 81) and failing to seek indemnity from them or any other Officer Defendant for the harm they caused Forterra, Defendants have caused Forterra to waste valuable corporate assets.

109.   As a result of Defendants' corporate waste, they are liable to the Company.

**COUNT V**

**UNJUST ENRICHMENT AGAINST THE OFFICER DEFENDANTS**

110.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.   As a result of the conduct described above, all of the Officer Defendants were unjustly enriched at the expense of Forterra in terms of the cash bonuses they received for improperly overstating Forterra's FY16 financial results and for not being called upon to account for their misconduct at Forterra that has exposed the Company to tens of millions of dollars in potential liability.  These Defendants should be required to disgorge the gains that they have and/or will otherwise unjustly obtain at the expense of Forterra.  A constructive trust for the benefit of the Company should be imposed thereon.

112.   Defendants Bradley, Brown, and Kerfin also collectively obtained approximately $4.375 million in severance (as detailed *supra* at ¶¶72, 76, and 81),

benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the aforesaid conduct. A constructive trust for the benefit of the Company should be imposed thereon.

113.   All the cash bonuses paid and severance payments provided to these Defendants were at the expense of Forterra. The Company received no benefit from these payments and Forterra was seriously damaged by such payments.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Declaring that the 2016 Annual Report and 2017 Proxy distributed by Defendants to shareholders were materially false and misleading, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder;

B.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

C.     Directing all Defendants to account for all damages caused by them, as well as all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all severance payments and payments of cash bonuses, and imposing a constructive trust thereon;

D.     Directing Forterra to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward, for a shareholder vote, resolutions amending the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the adoption of the following Corporate Governance policies:

(i)     reforming Forterra's executive compensation program, including placing a ban on paying cash bonuses in monthly installments before the Company's financial statements have been finalized and audited;

(ii)     appropriately testing and then strengthening the internal audit and control function;

(iii)     a proposal to strengthen the Forterra Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iv)     enhancing the Board's independence standards by banning affiliates of any controlling shareholder from serving as board members; and

(v)     terminating E&Y as Forterra's outside auditor and rotating independent auditing firms every five years.

E.     Ordering the imposition of a constructive trust over Defendants' improper severance payments and other cash bonuses;

F.      Awarding punitive damages;

G.      Awarding the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

ANDREWS & SPRINGER LLC

*Of Counsel*:

Samuel H. Rudman
Mary K. Blasy
ROBBINS GELLER RUDMAN
 & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  (631) 367-7100
Facsimile: (631) 367-1173
Email: srudman@rgrdlaw.com
        mblasy@rgrdlaw.com

Curtis V. Trinko
LAW OFFICES OF CURTIS V.
 TRINKO, LLP
39 Sintsink Drive West, 1st Floor
Port Washington, NY 11050
Telephone:  (516) 883-1437
Email: ctrinko@trinko.com

*/s/ David M. Sborz*
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE  19807
Telephone:  (302) 504-4957
Facsimile:  (302) 397-2681
Email: pandrews@andrewsspringer.com
cspringer@andrewsspringer.com
dsborz@andrewsspringer.com

*Counsel for Plaintiff*

Kenneth A. Elan
LAW OFFICES OF KENNETH
  A. ELAN
217 Broadway, Suite 603
New York, NY  10007
Telephone:  (212) 962-1224
Email: elanfirm@yahoo.com

Dated:  September 23, 2019